UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
SEP 27 2017
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

_____

LIU YAO-YI, ET AL.,

                Plaintiffs,

       v.

WILMINGTON TRUST COMPANY,

                Defendant.

_____

**DECISION AND ORDER**

6:14-CV-06631 EAW

### **INTRODUCTION**

Plaintiffs, Taiwanese investors, bring this putative class action against defendant Wilmington Trust Company ("Defendant" or "Wilmington"), alleging claims for aiding and abetting fraud, aiding and abetting conversion, aiding and abetting breach of fiduciary duty, gross negligence, and breach of fiduciary duty. (Dkt. 16). Presently before the Court is Defendant's motion to dismiss Plaintiffs' First Amended Complaint (the "amended complaint") pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6). (Dkt. 19). Because Plaintiffs have plausibly asserted claims for aiding and abetting a breach of fiduciary duty, gross negligence, and breach of fiduciary duty, Defendant's motion to dismiss those claims is denied. However, Plaintiffs have failed to plausibly allege claims for aiding and abetting fraud, and aiding and abetting conversion. Therefore, for the reasons set forth below, Plaintiffs' claims for aiding and abetting fraud and aiding and abetting conversion are dismissed.

- 1 -

## FACTUAL BACKGROUND

Plaintiffs are Taiwanese residents[1] who purchased interests in investment funds, known as the Bio Profit Series, LLC ("BPS") Funds. (Dkt. 16 at ¶¶ 1, 39-50). Plaintiffs allege that between 2005 and 2013, the BPS Fund managers operated the Funds as a Ponzi scheme, causing Plaintiffs' investment to lose value. As a result, Plaintiffs filed this action against Wilmington—the bank at which the BPS Fund managers maintained their accounts—alleging that Wilmington knowingly assisted in the Ponzi scheme, was grossly negligent in failing to discover the scheme, and breached its fiduciary duties.

The following recitation of facts is taken from Plaintiffs' amended complaint, which is over 70 pages long and contains approximately 300 numbered paragraphs. Plaintiffs allege that Velocity Investment Group, Inc. ("Velocity"), based in Pasadena, California, was an entity owned and controlled by Michael Wang ("Wang") with the assistance of Wendy Ko ("Ko") (collectively, "the Fund managers"), both of whom were also located in California. (*Id.* at ¶¶ 17, 60). Through Velocity, Wang and Ko managed the California-based BPS Funds and solicited investors to invest in such funds by informing them that the investor money would be primarily used for buying and making residential loans, secured by first or second deeds of trust and mortgages on real property located in California, and buying and making commercial loans, secured by real property. (*Id.* at ¶ 17).

---

[1] The amended complaint alleges that the vast majority of investors who were victims of the fraudulent scheme were located in Taiwan, Hong Kong, and mainland China, although some investors were located in the United States "and elsewhere." (Dkt. 16 at ¶ 57). All of the named plaintiffs are identified as residents of Taiwan. (*Id.* at ¶¶ 39-50).

Plaintiffs allege that BPS consisted of several California-based investment funds purporting to invest in real estate—including BPS Funds I, II, III, and V, and Velocity Valley & Grand ("VVG") (*id.* at ¶ 2)—although these entities actually functioned as one fraudulent entity with investor funds being commingled among the BPS Funds' Wilmington escrow/custodial/trust accounts (*id.* at ¶ 3). Plaintiffs' amended complaint alleges that, in order to assure the investors that their invested monies were safe, the Fund managers entered into "escrow and/or custodial/trust agreements" with Wilmington for the BPS Funds, and established "custodial/escrow/trust accounts" for such funds with Wilmington. (*Id.* at ¶ 4). Plaintiffs further allege that the escrow/custodial/trust accounts were opened for the benefit of the investors and/or for the safekeeping of their funds, and Wilmington—the trustee, custodian and/or escrow agent—undertook certain custodial/escrow duties to those investors, including the duties to monitor those accounts, oversee the transactions in the accounts, safeguard the investor money while in its custody, and transfer the investor money to the BPS Fund in which such money was intended to be held for use according to each fund's Private Placement Memorandum ("PPM") and Subscription Agreement provisions (the "Use of Proceeds Provisions"). (*Id.* at ¶ 5).

Plaintiffs allege that their money was being converted, with Wilmington's assistance, by the Fund managers. Pursuant to instructions in the offering memoranda, investors sent their money, through checks made payable to "Wilmington Trust Company as Escrow Agent for [each BPS Fund, respectively]," to Velocity's offices with the understanding that it would be transferred to a Wilmington escrow account. (*Id.* at ¶¶ 66,

68). After their money was deposited in certain Wilmington escrow or custodial accounts, instead of being invested in real estate loans as represented in each BPS Fund's offering materials, investor money was "improperly – and knowingly – transferred by Wilmington," at the request of the Fund managers, to other BPS Funds' escrow/custodial/trust accounts held by Wilmington, commingled in those accounts with money of investors in other BPS Funds, and/or paid out of the Wilmington accounts as "interest" or "redemption" to other BPS investors. (*Id.* at ¶ 6). Plaintiffs allege that as a result of their participation in the scheme, Wilmington profited in fees from serving as the trustee, custodian, and/or escrow agent for the BPS Funds. (*Id.* at ¶ 10).

Plaintiffs contend that while misconduct occurred in several escrow/custodial accounts, BPS Fund I became the "epicenter" of the scheme. (*Id.* at ¶¶ 12, 23). Ultimately, through an investigation by the Securities and Exchange Commission ("SEC"), the Ponzi scheme was exposed and Plaintiffs discovered their monies were gone. (*Id.* at ¶ 13).

Plaintiffs allege that Wilmington engaged in the fraudulent scheme in four ways: (1) using new-investor monies to make "interest" and redemption payments to existing investors; (2) commingling investor money among the BPS Funds, in violation of its custodial and fiduciary duties to investors; (3) diverting investor money from the custodial accounts it managed and oversaw without the investors' knowledge or permission; and (4) assisting the Fund managers in their fraud, breach of fiduciary duty to the BPS Fund investors, and conversion of investor money in violation of its own fiduciary duties to such investors. (*Id.* at ¶ 14). Plaintiffs further allege that the investors,

- 4 -

when deciding to invest in the BPS Funds, understood and believed Wilmington's role to be that of an escrow agent for their funds, and that the accounts in which their money was going to be held were to be escrow—or trust—accounts. (*Id.* at ¶ 27).

Plaintiffs allege that Wilmington entered into escrow/custodial agreements with each BPS Fund, respectively, of which the BPS Fund investors were third-party beneficiaries. (*Id.* at ¶ 28). Pursuant to those agreements, Wilmington undertook various duties, including to monitor and safeguard the BPS Fund investors' monies and to disburse those funds pursuant to the terms of the BPS Funds' offering materials. (*Id.*). Plaintiffs similarly allege that these offering materials indicated that Wilmington was the escrow agent for the respective BPS Fund's investor proceeds (*id.* at ¶ 65), and that Wilmington may be held liable to the investors for the loss of the funds held in the escrow accounts in cases of gross negligence or willful misconduct (*id.* at ¶ 69).

Plaintiffs allege that Wilmington assigned the same two individuals to oversee and manage all BPS Fund custodial/trust/escrow accounts, Sally Molina ("Molina") and Scott Huff ("Huff") (*id.* at ¶¶ 30, 201), and that those employees developed a close working relationship with Ko and Wang, a keen understanding of the scheme's business and operations, and extensive knowledge of the sources and destinations of the BPS Funds' cash inflows and outflows (*id.* at ¶ 31). For example, Plaintiffs allege that upon the deposit of new investor money in the BPS Fund accounts, Wilmington's trust account specialist overseeing those accounts was frequently contacted by the "BPS Funds' principals" and directed to transfer the new investor money from the respective account in which it was deposited chiefly to the BPS I custodial/escrow account. (*Id.* at ¶ 32).

- 5 -

Wilmington would then be directed by the BPS Funds' principals to wire massive amounts from the BPS I custodial/escrow account to "clearly improper uses" as alleged in the amended complaint, including payments to Wang and his family. (*Id.* at ¶ 33). These transactions occurred for about seven years, concluding in 2013, and involved around $150 million in investor monies. (*Id.* at ¶ 143). Plaintiffs allege that as a result of the Fund manager's scheme and Wilmington's misconduct, they have "lost a substantial portion of the money they invested in the BPS Funds." (*Id.* at ¶¶ 252, 263, 275, 287, 298).

## PROCEDURAL HISTORY

Plaintiffs filed their initial complaint on November 6, 2014. (Dkt. 1). Defendant moved to dismiss that complaint on May 1, 2015. (Dkt. 13). Plaintiffs thereafter filed the operative pleading in this case—the amended complaint—on May 22, 2015. (Dkt. 16). Defendant filed the pending motion to dismiss on June 19, 2015. (Dkt. 19). On July 24, 2015, Plaintiffs filed their response papers, and Defendant replied on August 7, 2015. (Dkt. 24; Dkt. 26). Plaintiffs obtained permission to file a sur-reply (Dkt. 28; Dkt. 29), which was filed on August 18, 2015 (Dkt. 31).

The Court scheduled oral argument for November 13, 2015. (Dkt. 32). Oral argument was rescheduled for January 4, 2016. (Dkt. 33). Prior to oral argument, Plaintiffs filed a notice of supplemental authority on December 17, 2015. (Dkt. 34). Defendant responded on December 23, 2015 (Dkt. 35), and Plaintiffs replied on the same day. (Dkt. 36). Oral argument was held on January 4, 2016, and the Court reserved decision on the motion. (Dkt. 37).

Following oral argument, the Court received submissions from the parties via facsimile. Plaintiffs sent a letter dated January 5, 2016, relating to Exhibit 4 to the amended complaint. Defendant responded via facsimile on January 7, 2016. Plaintiffs then filed a motion for leave to file a response to Defendant's January 7 "letter brief" on January 8, 2016. (Dkt. 38). Defendant replied in kind with its own response on the same day (Dkt. 39), and Plaintiffs filed a second motion to file a response to the letter brief on January 11, 2016 (Dkt. 40).

Then, the parties continued to communicate to the Court through letter submissions. On June 16, 2016, counsel for Defendant sent a letter to the Court. Plaintiffs' counsel responded by letter, dated June 17, 2016. Counsel for Defendant sent a further letter on July 7, 2016, and Plaintiffs' counsel also submitted a further letter on July 10, 2016. On September 23, 2016, the Court entered a Text Order indicating that it would "accept and consider all post-argument communications submitted by the parties," and placed all such communications on the docket. (Dkt. 41).

## DISCUSSION

### I. Motion to Dismiss Standard

"'In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.'" *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996) (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)). A court should consider the motion by "accepting all factual allegations in the complaint

and drawing all reasonable inferences in the plaintiff's favor." *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (internal quotations and citation omitted). To withstand dismissal, a plaintiff must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (internal quotations and citations omitted). Thus, "at a bare minimum, the operative standard requires the plaintiff [to] provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (alteration in original) (internal quotations and citations omitted).

## II.   Documents Considered by The Court on This Motion

In connection with the pending motion, both parties rely on a number of documents in addition to the operative pleading. "A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the

complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations omitted). To be incorporated into the complaint by reference, "the [c]omplaint must make a clear, definite and substantial reference to the documents." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (internal quotation marks and citation omitted). For example, where a complaint "explicitly refers to and relies upon" the documents outside of the complaint, those documents are incorporated by reference. *Sira*, 380 F.3d at 67. Moreover, even if not incorporated by reference into a complaint, documents that a plaintiff "either [had] in its possession or had knowledge of and upon which [it] relied in bringing suit," may be properly considered by a court on a Rule 12(b)(6) motion. *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

Plaintiffs attach a number of documents to the amended complaint, which are similarly referenced in the amended complaint, as set forth below.

- Exhibit 1 – a statement of account cover sheet for account number xxxxx5-000, alleged to represent an escrow account opened pursuant to a June 9, 2005, escrow agreement between Wilmington and BPS Fund I. (Dkt. 16 at ¶¶ 84-86).

- Exhibit 2 – a document entitled "Escrow Agreement (Private Placement Offering)" between Wilmington, as escrow agent, and Velocity Equity Fund II, LLC, referenced in the amended complaint as an "example" of the provisions of an escrow agreement used by Wilmington and the BPS Funds. (*Id.* at ¶ 96).

- Exhibit 3 – a statement of account cover sheet for account number xxxxx6-000, alleged to represent a custodial (trust) account opened pursuant to a December 18, 2008, custodial agreement between Wilmington and BPS Fund I. (*Id.* at ¶¶ 99-101).

- Exhibit 4 – a Wilmington activity detail purportedly showing fees charged by Wilmington as co-trustee for one of several BPS Fund custodial/trust/escrow accounts. (*Id.* at ¶ 112).

- Exhibit 5 – a fax from Wang to Huff directing that monies be transferred from a BPS Fund I escrow account to a trust account for "preparation for investment funding." (*Id.* at ¶ 125).

- Exhibit 6 – examples of communications between Wilmington and Wang and/or Ko, where the Wilmington accounts are referred to as "trust accounts" and "escrow accounts." (*Id.* at ¶ 186).

- Exhibit 7 – an example of a check from an investor sent by Ko to Wilmington with deposit instructions. (*Id.* at ¶ 189).

- Exhibit 8 – an example of communications from Velocity to Wilmington directing the deposit of investor funds into a BPS Fund I "trust account." (*Id.* at ¶ 210).

- Exhibit 9 – an example of communications from Molina to Ko, allegedly reflecting knowledge that BPS Funds contain investment funds. (*Id.* at ¶ 211).

Plainly, all of the above documents attached to and referenced in the amended complaint may be properly considered on this motion to dismiss. *Sira*, 380 F.3d at 67.

In support of its motion to dismiss, Defendant submits a Declaration from Michael C. Driscoll, Administrative Vice-President and Senior Counsel at M&T Bank, the parent company of Wilmington. (Dkt. 19-2). Driscoll attaches to his Declaration the documents set forth below.

- Exhibit A – the escrow agreement between Wilmington, Bio Profit Series, I, LLC ("BPS I, LLC"), and Velocity, dated June 9, 2005, for account number xxxxx9608. (Dkt. 19-3).

- Exhibit B – the account opening documents for a business deposit account, number xxxxx9608, executed by BPS I, LLC, on June 10, 2005. (Dkt. 19-4).

- Exhibit C – the custody account agreement for account number xxxxx6-000 between Wilmington and BPS I, LLC, executed by Wilmington on December 18, 2008. (Dkt. 19-5).

- Exhibit D – the escrow agreement between Wilmington, Bio Profit Series, II, LLC ("BPS II, LLC"), and Velocity, dated November 27, 2007, for account number xxxxx0-000. (Dkt. 19-6).

- Exhibit E – the custody account agreement for account number xxxxx0-000 between Wilmington and, presumably, BPS II, LLC, executed by Wilmington on January 17, 2008. (Dkt. 19-7).

- Exhibit F – the escrow agreement between Wilmington, Bio Profit Series, III, LLC ("BPS III, LLC"), and Velocity, dated November 27, 2007, for account number xxxxx1-000. (Dkt. 19-8).

- Exhibit G – the custody account agreement for account number xxxxx1-000 between Wilmington and BPS III, LLC, executed by Wilmington on January 17, 2008. (Dkt. 19-9).

- Exhibit H – the escrow agreement between Wilmington, Bio Profit Series, V, LLC ("BPS V, LLC"), and Velocity, dated December 9, 2011. (Dkt. 19-10).

- Exhibit I – the custody agreement for account number xxxxx2-000 between Wilmington and BPS V, LLC, dated December 9, 2011. (Dkt. 19-11).

In other words, Defendant attaches to its motion to dismiss papers the custody and escrow agreements involving BPS Funds I, II, III, and V, which, along with the VVG fund, are the subject of and specifically referenced in the amended complaint. (*See* Dkt. 16 at ¶¶ 18, 84-110).

In opposition to Defendant's motion to dismiss, Plaintiffs submit a document described as the escrow agreement between Wilmington and VVG, involving the VVG fund, which was executed on October 20, 2009 (Dkt. 24-6), and in response, Defendant submits that same escrow agreement related to the VVG fund (Dkt. 26-2).

- 11 -

All of the foregoing agreements may also be properly considered by the Court on this motion to dismiss because they are plainly referenced in the amended complaint and incorporated by reference. *Sira*, 380 F.3d at 67. Indeed, neither party argues that the Court may not consider these documents.

However, in further opposition to Defendant's motion to dismiss, Plaintiffs submit filings from a separate litigation commenced by the SEC in the United States District Court for the Central District of California (Dkt. 24-2; Dkt. 24-3; Dkt. 24-4; Dkt. 24-5), as well as various communications and wire transfer orders between Wang and Wilmington (Dkt. 24-8; Dkt. 24-9; Dkt. 24-10; Dkt. 24-11; Dkt. 24-14), and account statements for the VVG account, number xxxxx1-000 (Dkt. 24-7) and BPS Fund I account, number xxxxx6-000 (Dkt. 24-12; Dkt. 24-13). Defendant argues that the filings from the federal court litigation in California may be considered to establish their existence, but may not be considered for the truth of any matters within the filings (Dkt. 26 at 6), and this is indeed correct. *See, e.g., Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (quotation and citation omitted)). With respect to the additional account statements and communications, the Court acknowledges that Plaintiffs have submitted with their sur-reply a chart purporting to cross-reference these additional documents to specific paragraphs in the amended complaint. (Dkt. 31-1). However, the documents, although potentially relevant to the allegations referenced in Plaintiffs' amended complaint, are not

specifically referenced.  Therefore, it would be improper for the Court to consider these documents on this pending motion.  *See Mosdos Chofetz Chaim, Inc.*, 815 F. Supp. 2d at 69 (stating that in order to be incorporated into a complaint by reference, "the [c]omplaint must make a *clear, definite and substantial reference* to the documents."  (emphasis added)).

The one exception is Exhibit 10 attached to Plaintiffs' opposition, where by letter, dated January 5, 2016, Plaintiffs explained that "pages 2 and 4 of 76 (a statement for account 6000, showing Wilmington's receipt of co-trustee fees on that account)" should have been attached as Exhibit 4 to the amended complaint, but—through an inadvertent error—a different account statement was attached. (Dkt. 41 at 1). Although technically leave to amend should have been sought by Plaintiffs, the Court will accept these additional pages contained in the "correct document" appearing at Docket 24-12, although the Court's review of these pages does not reveal the information that Plaintiff contends it shows.

## III. <u>Choice of Law</u>

Defendant contends that Delaware law applies to its motion to dismiss as the place where the allegedly wrongful conduct occurred. (Dkt. 19-1 at 9-12). In their opposition papers, Plaintiffs do not specifically dispute Defendant's argument that Delaware law applies, and rely on case law from California—along with New York and Delaware—in arguing their opposition to the motion to dismiss. Plaintiffs assert that there is no conflict among Delaware, New York, and California law in this case, and that the Court may use California law because it is "undoubtedly" the situs of the injury alleged here. (Dkt. 24 at

33-34). However, at oral argument, Plaintiffs' counsel expressed no reservation about the application of Delaware law, and admitted that Delaware law is the applicable law in this matter.[2] Therefore, the Court will apply Delaware substantive law to dispose of Defendant's motion to dismiss.[3] *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 MD 2030 (LAP), 2010 WL 1924719, at *4 (S.D.N.Y. May 11, 2010), *aff'd sub nom. La. Stadium & Exposition Dist. v. Fin. Guar. Ins. Co.*, 701 F.3d 39 (2d Cir. 2012).

## IV. <u>Statute of Limitations Defense</u>

Defendant argues that any and all transactions relied upon by Plaintiffs in support of their claims that occurred prior to November 6, 2011, are time barred under Delaware's three-year statute of limitations. (Dkt. 19-1 at 12-13). Plaintiffs respond that regardless of the law that applies, their claims are not time barred because their claims

---

[2] Plaintiffs' counsel also agreed that New York law and Delaware law are the same regarding aiding and abetting claims.

[3] Although Delaware law governs the disposition of this case, the parties have discussed decisional law arising out of New York federal courts, and this Court finds the factual underpinnings of those cases to be instructive. *See generally El Camino Res., LTD. v. Huntington Nat. Bank*, 722 F. Supp. 2d 875, 904 (W.D. Mich. 2010) (noting that New York and California "have primary jurisdiction over most of the banks in this country[, and] . . . therefore [it should] be no surprise that those courts have had the most experience in analyzing aiding-and-abetting claims against banks in a variety of factual circumstances and have devoted the most thought to the competing interests implicated by such claims"), *aff'd*, 712 F.3d 917 (6th Cir. 2013). Notably, the Court finds no meaningful difference between the requirements of alleging an aiding and abetting claim under Delaware law as opposed to New York law. *See Capitaliza-T, Sociedad De Responsabilidad Limitada De Capital Variable v. Wachovia Bank of Del., Nat. Ass'n*, ("*Capitaliza-T III*") No. CIV.A. 10-520-RGA, 2012 WL 3150386, at *1 (D. Del. Aug. 2, 2012) (clarifying that under Delaware law, the plaintiff must allege actual knowledge of the misconduct to establish aiding and abetting liability); *In re Agape Litig.*, ("*Agape II*") 773 F. Supp. 2d 298, 307-08 (E.D.N.Y. 2011) (stating the elements of aiding and abetting fraud under New York law, and further stating that New York law requires the complaint to set forth allegations that the defendant have actual knowledge of the fraud).

were tolled under various legal theories, including the continuing wrong doctrine, the discovery rule due to fraudulent concealment, and equitable tolling. (Dkt. 24 at 34-35).

Under Delaware Law, a three-year statute of limitations governs the types of claims asserted by Plaintiffs in the amended complaint. *In re The Brown Schs.*, 368 B.R. 394, 402 (D. Del. 2007) (stating that claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty are governed by a three-year statute of limitations); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. Civ.A. 762-N, 2005 WL 1594085, at *11-12 (Del. Ch. June 29, 2005) (stating that claims for gross negligence, breach of fiduciary duty, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty, among others, are governed by a three-year statute of limitations); *Allstaff, Inc. v. Wilmington Trust Co.*, No. 10C-02-014 (RBY), 2010 WL 4056122, at *2 (Del. Super. Ct. Sept. 7, 2010) (stating that aiding and abetting conversion claim is governed by three-year-statute of limitations), *aff'd*, 16 A.3d 937 (Del. 2011).

Delaware courts recognize the doctrines of "inherently unknowable injuries," "fraudulent concealment," and "equitable tolling" to delay the running of the statute of limitations. *In re Dean Witter P'ship Litig.*, No. CIV. A. 14816, 1998 WL 442456, at *5 (Del. Ch. July 17, 1998) ("Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them."), *aff'd*, 725 A.2d 441 (Del. 1999). "Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility." *Id.*; *see Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646, 651 (Del. Super. Ct. 1985) ("Under the

time of discovery rule, the limitations period does not begin to run until the plaintiff has reason to know that a wrong has been committed."). "For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and [the] plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury." *Dean Witter P'ship*, 1998 WL 442456, at *5.

"Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary." *Id.* at *6. Delaware courts recognize that even "diligent" investors may fall victim to the injurious "self-interested acts" of a fiduciary, where those investors have otherwise placed their "good faith" reliance upon the fiduciary's conduct. *Kahn v. Seaboard Corp.*, 625 A.2d 269, 276 (Del. Ch. 1993). "This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong." *Dean Witter P'ship*, 1998 WL 442456, at *6.

Delaware courts also permit the "continuing wrong doctrine" to be raised as a bulwark against an otherwise viable statute of limitations defense. *See Ewing v. Beck*, 520 A.2d 653, 662 (Del. 1987) ("If the allegation in a Complaint for continuing negligent medical treatment during a finite period is supported by the facts in the record, the statute of limitations runs from the date of the last act in the negligent continuum."). Under Delaware law, this doctrine "applies only when 'the alleged wrongful acts are . . . so inexorably intertwined that there is . . . one continuing wrong.' In the same vein, it is

- 16 -

settled that the failure to remedy a wrong does not mean that the wrong is continuing."
*Desimone v. Barrows*, 924 A.2d 908, 925 (Del. Ch. 2007) (emphasis omitted) (quoting
*Ewing*, 520 A.2d at 662).

The Court need not resolve the statute of limitations issue at the motion to dismiss
stage of this proceeding because Plaintiffs have sufficiently raised potential defenses to
the application of the statute of limitations that cannot be resolved without discovery.
*See Winshall v. Viacom Int'l, Inc.*, No. N15C-06-137 (EMD)(CCLD), 2016 WL 3462119,
at *10 (Del. Super. Ct. Feb. 29, 2016) ("Given the complicated facts and timeline in this
case and given that [the plaintiff] is arguing that [the defendant] committed fraud, it is
premature for the Court to [apply the statute of limitations] before discovery has taken
place. Discovery should clarify whether there is genuine issue as to a material fact on
whether the statute of limitations acts as a bar to Counts I–III and, therefore, this issue
could be revisited on a motion for summary judgment."); *Capital One, N.A. v. Bachovin*,
No. CV N14L-07-102, 2015 WL 5968537, at *4 (Del. Super. Ct. Oct. 7, 2015) (declining
to apply the statute of limitations for fraud because it was "unclear from the facts
presented . . . whether a tolling exception applies"); *Council of Unit Owners of Sea
Colony E. v. Carl M. Freeman Assocs., Inc.*, No. CIV.A. 86C-AU-52, 1988 WL 130461,
at *1 (Del. Super. Ct. Nov. 15, 1988) (denying motion for reconsideration because "the
question of whether fraud and fraudulent concealment existed during the [relevant] time"
implicated "factual issues" that had bearing on whether the statute of limitations applied,
and thus, finding the application of the limitations defense as not ripe for determination).

Accordingly, insofar as Defendant seeks dismissal of the amended complaint on statute of limitations grounds, the motion is denied without prejudice.

## V.    Failure to State a Claim

### A.    Aiding and Abetting Liability

Plaintiffs assert three causes of action based upon aiding and abetting: (1) aiding and abetting fraud; (2) aiding and abetting conversion; and (3) aiding and abetting breach of fiduciary duty.  Defendant contends that these causes of action must be dismissed for failure to state a claim because Plaintiffs have not sufficiently alleged that Defendant had actual knowledge of the fraudulent scheme, or that Defendant substantially assisted the alleged wrongdoing.

Under both Delaware and New York law, actual knowledge of the wrongful activity on the part of the alleged aider and abettor is required to sustain a claim for aiding and abetting fraud, conversion, or breach of fiduciary duty. *Capitaliza-T III*, 2012 WL 3150386, at *1; *Agape II*, 773 F. Supp. 2d at 307-08.  This element is critical to the disposition of Plaintiff's claims.  *See In re Jevic Holding Corp.*, No. 08-11006 BLS, 2011 WL 4345204, at *13 (Bankr. D. Del. Sept. 15, 2011) (stating that "[p]roof of scienter is the crux of a successful claim" of aiding and abetting a breach of fiduciary duty (citing *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006))).

### 1.    Aiding and Abetting Fraud

Under Delaware common law, fraud consist[s] of: 1) a [specific] false
representation, usually one of fact, made by the defendant; 2) the
defendant's knowledge or belief that the representation was false, or was
made with reckless indifference to the truth, or by the deliberate
concealment of material facts, or by silence in the face of a duty to speak

. . . in order to prevent statements actually made from being misleading; 3) an intent to induce the plaintiff to act or refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance.

*Nikolouzakis v. Exinda Corp.*, No. CA 11-1261-LPS-MPT, 2012 WL 3239853, at *5 (D. Del. Aug. 7, 2012) (internal quotations and citations omitted).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "This heightened pleading requirement of Rule 9(b) applies equally to claims alleging aiding and abetting fraud, claims alleging aiding and abetting breach of fiduciary duty sounding in fraud, and claims alleging aiding and abetting conversion premised on fraud." *Berman v. Morgan Keegan & Co.*, No. 10 CIV. 5866 PKC, 2011 WL 1002683, at *7 (S.D.N.Y. Mar. 14, 2011) (citing *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91-92 (2d Cir. 2000) (applying Rule 9(b) to aiding and abetting fraud claims)), *aff'd*, 455 F. App'x 92 (2d Cir. 2012).

The plain language of "Rule 9(b) permits '[m]alice, intent, [and] knowledge' to be averred generally." *Agape II*, 773 F. Supp. 2d at 307 (quoting Rule 9(b)). "However, because courts 'must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations[,] . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.'" *Id.* at 307-08 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of

conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

"To prove a claim of aiding and abetting, a plaintiff must demonstrate that (1) a wrongful act was committed; (2) the defendant had knowledge of the act; and (3) the defendant knowingly and substantially participated in or provided substantial assistance for the wrongful act." *Brug v. Enstar Grp., Inc.*, 755 F. Supp. 1247, 1256 (D. Del. 1991). "In order to state a claim for aiding and abetting fraud under . . . Delaware law, the plaintiff must allege that defendant had knowledge of the underlying fraud." *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 517 (D. Del. 2012). "[A]ctual knowledge is the standard for imposing liability for aiding and abetting." *Capitaliza-T III*, 2012 WL 3150386, at *1.

Here, Plaintiffs make a number of allegations regarding Defendant's awareness of the Fund managers' alleged fraudulent conduct. Specifically, Plaintiffs allege that Defendant provided "highly personalized services" to the Fund managers and that Huff and Molina established a close professional relationship with Wang and Ko. (Dkt. 16 at ¶¶ 207, 217). Plaintiffs emphasize that Huff and Molina oversaw a substantial volume of illicit transactions relating to the BPS Funds over several years. (*Id.*). Plaintiffs further allege that Huff and Molina "executed atypical transactions and/or fraudulent transactions" at the behest of the Fund managers, most frequently arising out of the "BPS [Fund] I escrow and custodial accounts" (*id.* at ¶ 208), and that Defendant knew the monies invested in the BPS Funds were investor proceeds (*id.* at ¶¶ 209-11). Plaintiffs also assert that the "massive volume of highly suspicious transactions . . . may have

'only' amounted in some cases to individual red flags," but together they constituted a "'forest of red flags,'" which made it "inescapably obvious" that the Fund managers were stealing money from the BPS investors. (*Id.* at ¶ 225).

Plaintiffs state that Defendant was also aware that the Fund managers "were paying distributions, 'interest' payments, and/or 'redemptions,' to other BPS Fund investors from the same Wilmington escrow/custodial accounts." (*Id.* at ¶¶ 212-13, 218-19). Plaintiffs allege that Defendant became aware of the misuse of investor funds each time Molina or Huff processed the Fund managers' requests to divert BPS investor monies to another account, commingling them with other investor funds. (*Id.* at ¶¶ 214-16).

Plaintiffs further allege that Defendant was aware of the Fund managers' fraudulent conduct because Defendant received "substantial benefits" from its participation in the scheme. (*Id.* at ¶ 220). Specifically, Defendant allegedly derived hundreds of thousands of dollars from BPS investor monies by charging "trustee/custodian/escrow fees." (*Id.* at ¶¶ 221-22). In addition, Plaintiffs also claim that Defendant received additional fees based on the quantity of wire transfers it processed, creating a "perverse incentive" for Defendant to maximize the number of "improper and atypical money transfers." (*Id.* at ¶ 223).

Despite these allegations, the Court finds that Plaintiffs' allegations do not surmount the heightened pleading requirement for alleging *actual* knowledge of *fraudulent* conduct. The allegedly close professional relationship between the Fund managers and Huff and Molina does not come close to alleging actual knowledge of

fraud. The fact that Ko and Molina allegedly spoke to one another on a "first name basis," and frequently communicated with one another to do business, simply does not give rise to a strong inference of actual knowledge. *See Agape II*, 773 F. Supp. 2d at 317 (finding the absence of actual knowledge where the defendant's Senior Client Manager and the fraudster allegedly "had frequent lunch meetings . . . where they discussed [the fraudster's] business and the accounts"); *Berman*, 2011 WL 1002683, at *4 (dismissing the complaint for failure to state claims for aiding and abetting fraud and aiding and abetting breach of fiduciary duty where it was alleged that the defendant's senior vice president "was a personal friend" of certain directors and officers of the fraudster entity, and oversaw transactions with the fraudster entity and its accounts at the defendant bank). Relatedly, Plaintiffs' assertion that Defendant's personalized services and its obligation to "know their customers" made it aware of the alleged wrongful conduct (*see* Dkt. 16 at ¶ 174), at most, could only create a plausible inference of *constructive* knowledge of potential misconduct. *See Berman v. Morgan Keegan & Co.*, 455 F. App'x 92, 95-96 (2d Cir. 2012) ("'Know Your Customer' obligations are, standing alone, far from sufficient to support a strong inference that [the defendant] had actual knowledge of [the] fraud.").

In addition, the allegation that Defendant wrongfully granted Ko the responsibility of verifying Wang's signature on the wire requests—making Ko the "first line of defense against fraud" (Dkt. 16 at ¶ 202)—is similarly insufficient. *See Ryan v. Hunton & Williams*, No. 99-CV-5938 (JG), 2000 WL 1375265, at *9 n.7 (E.D.N.Y. Sept. 20, 2000) (finding the allegation that the bank "improperly permitted . . . a non-lawyer[]

to be a signatory on the . . . attorney escrow account" supported an inference of constructive notice of fraud, but not actual knowledge thereof). Therefore, the fact that Molina and Huff were in frequent communication with Wang and Ko, and processed their requested transactions, fails to satisfy Plaintiffs' pleading requirements.

Plaintiffs' further allegation that Defendant was aware that investor monies were being drawn from the BPS escrow accounts and placed into other investor accounts also fails to raise anything more than an inference of constructive knowledge of fraud. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) (finding the allegations that the attorney fiduciary had overdrawn from attorney trust accounts and transferred funds to his personal account to be insufficient to "create a strong inference of actual knowledge of [the fraudster's] outright theft of . . . funds"). Plaintiff's description of a "forest of red flags" is similarly unpersuasive. "Even where a bank was on notice of 'red flags' that indicated certain accounts may have been vehicles for fraudulent activity and referred the case to its internal fraud unit, the bank had only suspicions but not actual knowledge of fraud." *Nathel v. Siegal*, 592 F. Supp. 2d 452, 469 (S.D.N.Y. 2008); *see Agape II*, 773 F. Supp. 2d at 318 (noting that "[w]hile the Plaintiffs have gathered allegations of 'red flags' and suspicious circumstances, which in hindsight may appear to indicate the obviousness of the fraud," these allegations were not specific enough to raise a strong inference of actual knowledge). "[E]ven alleged ignorance of obvious warning signs of fraud will not suffice to adequately allege 'actual knowledge.'" *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 547 (S.D.N.Y. 2007); *see Nigerian Nat. Petroleum Corp. v. Citibank, N.A.*, No. 98 CIV. 4960 (MBM), 1999 WL 558141, at *8

(S.D.N.Y. July 30, 1999) (finding that the plaintiff's allegations of defendant's negligent disregard for suspicious circumstances failed to sufficiently allege actual knowledge).

Furthermore, the alleged volume of substantial "atypical money transfers" does not create a strong inference of "actual knowledge" of fraudulent conduct. *See Rosner v. Bank of China*, No. 06 CV 13562, 2008 WL 5416380, at *6 (S.D.N.Y. Dec. 18, 2008) (finding the allegations of "atypical" and "almost daily" large transfers and withdrawals that were "inconsistent with the account holder's business" did not give rise to a strong inference of actual knowledge), *aff'd*, 349 F. App'x 637 (2d Cir. 2009); *accord Capitaliza-T III*, 2012 WL 3150386, at *2 (finding that a $2.5 million transfer made by the fraudster from one bank to a special account maintained by the defendant, which was "unrelated to [the fraudster's] regular currency exchange operations," was not so atypical to sufficiently plead actual knowledge). Plaintiffs' related allegation that Defendant was motivated to process as many "atypical" transactions as possible in an effort to accumulate additional fees, serves them no better. *See Schmidt v. Fleet Bank*, No. 96 CIV. 5030 (AGS), 1998 WL 47827, at *7 (S.D.N.Y. Feb. 4, 1998) (finding allegations that the defendant bank was motivated "by the prospect of the increased fees received" to be "insufficient to allege scienter under Rule 9(b)").

Plaintiffs cite to *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101 (C.D. Cal. 2003), for the proposition that actual knowledge is not required if the aider and abettor also breaches its own duty to a plaintiff. (Dkt. 24 at 26). However, the Court disagrees that *Neilson* stands for the principle that an aider and abettor's own conduct can be a *substitute* for actual knowledge. *Neilson* ultimately found that the defendants had

actual knowledge because the complaint "allege[d], in particular, that the Banks utilized atypical banking *procedures to service Slatkin's accounts*, raising an inference that they knew of the Ponzi scheme and sought to accommodate it *by altering their normal ways of doing business*. This supports the general allegations of knowledge." *Neilson*, 290 F. Supp. 2d at 1120 (emphases added).

Accordingly, *Neilson* more accurately stands for the proposition that, at least in some instances, actual knowledge may be inferred—particularly where there are clear allegations that the aider and abettor has manifestly changed its normal operating procedures to encourage the primary tortfeasor's fraudulent conduct. Here, Plaintiffs alleged "atypical money *transfers*," which do not raise such an inference. *See MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 431 F. App'x 17, 20 (2d Cir. 2011) (stating, in the context of a negligence claim, that "it is not unusual for money to be transferred into and out of investment accounts; investment advisors could not buy and sell securities on behalf of their clients if they did not transfer money to and from various accounts"). In any event, Delaware law and California law are sufficiently similar on the subject of aiding and abetting liability, *see In re Syntax-Brillian Corp.*, 573 F. App'x 154, 162-63 (3d Cir. 2014) (finding that "Delaware's 'knowing participation' and California's knowing provision of 'substantial assistance or encouragement' . . . [were] sufficiently similar" so that a choice of law analysis is "unnecessary"), and with actual knowledge as the standard under Delaware law, it cannot be lightly inferred. *See Capitaliza-T III*, 2012 WL 3150386, at *1 (citing to *Agape II* favorably).

Plaintiffs also cite to *Benson v. J.P. Morgan Chase Bank, N.A.*, Nos. C–09–5272 EMC, C–09–5560 EMC, 2010 WL 1526394 (N.D. Cal. Apr. 15, 2010), for the proposition that "general allegations of knowledge of a Ponzi scheme supported by more detailed allegations of surrounding circumstances strikingly similar to this case" are sufficient to allege actual knowledge. (Dkt. 24 at 29). The *Benson* court dismissed the defendant's argument that the complaint failed to allege that the defendant had actual knowledge of the specific, primary wrongs allegedly committed. *Benson*, 2010 WL 1526394, at *2. Specifically, the California federal court found that actual knowledge was sufficiently alleged because the complaint alleged that the defendant performed two audits which revealed that the fraudster was not even registered to sell the securities the fraudster had been promoting to investors, and that the defendant knew the investors wrongfully believed they were purchasing these securities in the form of "certificates of deposit," colloquially referred to as "CDs." *Id.* at *3. The audits also revealed that "*none of the investor funds*" were being used for this purpose, and instead, they "were being wired to offshore bank accounts or being used to pay for [the fraudster] and his associates' personal expenses." *Id.* (emphasis added).

Plaintiffs ignore two critical distinctions between *Benson* and the instant matter. First, there is no allegation that the Fund managers were not permitted to engage in the purported security transactions at issue here—let alone that Defendant was aware of such impropriety—or that Defendant was aware that the BPS Funds were not created for the purpose of legitimate investment. Indeed, several of the transfer correspondence—which have been attached to the amended complaint—indicate that the monetary transfers were

being requested to facilitate "preparation for investment funding." (Dkt. 16-5 at 2; Dkt. 16-6 at 2-4). According to Plaintiffs, the offering materials promoting investment to the BPS investors indicated that their monies would be "invested in each particular Fund [and] would be used by that Fund to buy and make residential loans . . . [and] commercial loans." (Dkt. 16 at ¶ 62).

Second, it is significant that the *Benson* court's conclusion was also based upon the "close business relationship" between the defendant bank and the fraudster. *Benson*, 2010 WL 1526394, at *4. As already stated, Plaintiffs' allegations fall far short of raising a strong inference of actual fraud based upon the relationship between Huff and Molina and the Fund managers. Notably, *Agape II* distinguished *Benson* on this point, stating that "while the California court in *Benson* may have been willing, without more, to infer actual knowledge from a close relationship between a bank employee and the perpetrators of the Ponzi scheme, that holding is not consistent with the law in the Second Circuit." 773 F. Supp. 2d at 315.

Therefore, the Court concludes that Plaintiffs have failed to sufficiently allege a strong inference of actual knowledge required for asserting a cause of action for aiding and abetting fraud under Delaware law. As such, Defendant's motion to dismiss is granted.

### 2.    Aiding and Abetting Conversion

For the same reasons set forth above regarding Plaintiffs' cause of action for aiding and abetting fraud, Plaintiffs have failed to state a claim for aiding and abetting conversion because the amended complaint does not sufficiently allege that Defendant

had "actual knowledge" of any conversion of investor monies. Indeed, Plaintiffs rely on substantially the same allegations to present this cause of action, and thus, the same conclusion applies with equal force. (*See* Dkt. 16 at ¶¶ 244, 247, 255, 258). Furthermore:

> A conversion claim based on money deposited in an account but not returned is not recognized under Delaware law, which requires as an element of conversion the taking of specific property, and does not apply the tort to the failure to fulfill an obligation that may be met by the payment of money.

*Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v. Wachovia Bank of Del. Nat. Ass'n*, ("*Capitaliza-T I*") No. CIV. 10-520 JBS KMW, 2011 WL 864421, at *3 (D. Del. Mar. 9, 2011); *see Commerce Nat. Ins. Servs., Inc. v. Buchler*, No. CIV. 02-037-SLR, 2003 WL 22953225, at *6 (D. Del. Dec. 10, 2003) ("No Delaware court has 'recognized a cause of action for conversion of money, as opposed to goods.'" (quoting *Goodrich v. E.F. Hutton Grp., Inc.*, 542 A.2d 1200, 1203 (Del. Ch. 1988))), *aff'd*, 120 F. App'x 414 (3d Cir. 2004); *Xu Hong Bin v. Heckmann Corp.*, No. CIV.A. 4637-CC, 2009 WL 3440004, at *13 (Del. Ch. Oct. 26, 2009) ("In Delaware, an action in conversion will not lie to enforce a claim for the payment of money."). Therefore, Plaintiffs have failed to state a cognizable claim for aiding and abetting conversion under Delaware law, and Plaintiffs' second cause of action is dismissed.

### 3. Aiding and Abetting Breach of Fiduciary Duty

#### a. Actual Knowledge

Under Delaware law, to survive a motion to dismiss a claim for aiding and abetting breach of fiduciary duty, "the complaint must allege facts that satisfy the four

elements of an aiding and abetting claim: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (internal quotation and citation omitted). "The plaintiff must demonstrate that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach." *In re Opus E., LLC*, 528 B.R. 30, 80 (Bankr. D. Del. 2015) (internal quotation and citation omitted), *aff'd sub nom. In re: Opus E., LLC*, No. 09-12261, 2016 WL 1298965 (D. Del. Mar. 31, 2016); *see Malpiede*, 780 A.2d at 1097 ("Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."). Additionally, "[a] plaintiff must demonstrate the defendant's knowing participation with specific facts." *Nikolouzakis*, 2012 WL 3239853, at *44-45 (internal quotations omitted).

"In most cases, as here, the second and third prongs of the test are the most relevant in the context of a motion to dismiss." *In re Gen. Motors (Hughes) S'holder Litig.*, No. CIV.A. 20269, 2005 WL 1089021, at *23 (Del. Ch. May 4, 2005), *aff'd*, 897 A.2d 162 (Del. 2006).

> If such facts [of knowing participation] are not pled, then in order to infer knowing participation, the plaintiff must have alleged that the fiduciary breached its duty in an inherently wrongful manner. This has also been stated as requiring the plaintiff to allege that the act taken by the fiduciary was *per se* illegal.

*Id.* at *24 (internal quotations and citations omitted).

Plaintiffs allege that the Fund managers provided the BPS investors with offering materials, promising the BPS investors that their investments would be placed into escrow accounts with Defendant as the escrow agent. (Dkt. 16 at ¶ 20). Plaintiffs further allege that Defendant was privileged to the content of these offering materials. (*Id.* at ¶ 93). At oral argument, counsel for Defendant admitted that Defendant had been unable to determine whether its employees were aware of the content of the offering materials at this stage of this proceeding. Plaintiffs contend that the Fund managers had a fiduciary duty to the BPS investors as set out in the offering materials, and that Defendant was aware that this fiduciary duty had been breached because the Fund managers frequently requested the commingling and diversion of investor funds from their respective fiduciary BPS accounts. (Dkt. 24 at 7-8). The Court agrees that Plaintiffs have sufficiently stated a claim for aiding and abetting a breach of fiduciary duty.

In *Lerner*, the fraudster was an attorney fiduciary who had placed monies into fiduciary accounts to perpetuate a multi-million dollar Ponzi scheme. *Lerner*, 459 F.3d at 278-79. The attorney convinced his investors that their money would be secure and informed them that their monies would be held in escrow accounts. *Id.* at 279. The attorney fiduciary accounts were maintained at the defendant banks. The complaint made the following material allegations:

> [E]ach defendant had actual knowledge that [the attorney fiduciary] and his law firms violated their fiduciary duties to some or all of the plaintiffs, *inter alia*, by reason of the fact that [the] Attorney Fiduciary Accounts were overdrawn; numerous checks written on [the] Attorney Fiduciary Accounts were dishonored for insufficient funds; and [the attorney fiduciary] on numerous occasions . . . transferred funds from the [the] Attorney Fiduciary Accounts to his personal account(s).

*Id.* at 294 (quotations and citation omitted).

As here, the Second Circuit determined that the "red flags" alleged by the plaintiffs were insufficient to raise a strong inference of actual knowledge of the attorney fiduciary's "outright theft of client funds." *Id.* However, the *Lerner* court distinguished its conclusion upon the claim for aiding and abetting fraud, stating that "the claim for aiding and abetting a breach of fiduciary duty *does not* depend on such knowledge of *outright theft.*" *Id.* (emphases added). The Second Circuit determined that because the plaintiffs' allegations suggested the defendant bank was aware that the fraudster owed a fiduciary duty to the plaintiffs in the care of their funds, and was commingling those funds, these assertions were sufficient to state a claim for aiding and abetting breach of fiduciary duty. *Id.* ("[The attorney fiduciary]'s commingling of funds was not only an *indication* of a breach of fiduciary duty—it was, in and of itself, a breach.").

The amended complaint alleges that Defendant, at the behest of the Fund managers, made various transfers of BPS investor funds in and out of the BPS accounts. (*See, e.g.*, Dkt. 16 at ¶¶ 128-31, 214, 226). Plaintiffs also allege that these transfers were conducted to make interest and redemption payments to other investors, and in the process of doing so, commingled Plaintiffs' investments with other investor funds. (*See, e.g., id.* at ¶¶ 119, 267, 270). Plaintiffs further allege that the accounts are escrow/trust/custodian accounts, and in fact, there are indications that several of the BPS Fund accounts were "trust" accounts. (*See* Dkt. 16-5 at 2-3; Dkt. 16-6 at 2-4; Dkt. 16-8 at 2); *see also HBL Indus., A Div. of Houston Barge Line, Inc. v. Chase Manhattan Bank*

*(Nat. Ass'n)*, 45 B.R. 865, 868 (S.D.N.Y. 1985) ("A special account is one which the bank and depositor agree will be kept separate from the general funds of the bank."). Thus, as in *Lerner*, Plaintiffs' allegations—if proven true—would not only suggest that the Fund managers' had breached a fiduciary duty, they would also demonstrate a breach in fact. *See Lerner*, 459 F.3d at 294. And at this stage of the proceedings, the allegations are sufficient to allege actual knowledge of the breach by Defendant consistent with the standard set forth in *Lerner*.

### b.    Substantial Assistance

A claim for aiding and abetting liability requires not only that the defendant have actual knowledge of the breach of fiduciary duty, but also that the defendant garnish "substantial assistance or encouragement" towards the breach. *See Opus E., LLC*, 528 B.R. at 80). Under New York law,

> [s]ubstantial assistance occurs when a defendant affirmatively assists, helps conceal or *fails to act when required to do so*, thereby enabling the breach to occur. However, the mere inaction of an alleged aider and abettor constitutes substantial assistance *only if the defendant owes a fiduciary duty directly to the plaintiff.*

*Lerner*, 459 F.3d at 295 (emphases added). Delaware law also permits "[i]naction [to] form the basis of aiding and abetting liability if it rises to the level of providing substantial assistance or encouragement." *Jenkins v. Williams*, No. CIV.A.02-331-GMS, 2008 WL 1987268, at *14 (D. Del. May 7, 2008); *see also Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v. Wachovia Bank of Del. Nat. Ass'n*, ("*Capitaliza-T II*") No. CIV. 10-520 JBS/KMW, 2011 WL 6650329, at *6 (D. Del. Dec. 21, 2011) (finding substantial assistance in an aiding and abetting fraud claim where it

was alleged that the defendant's "inaction in failing to report [the fraudster's] atypical transaction was consciously done"), *rev'd in part on reconsideration*, No. CIV.A. 10-520-RGA, 2012 WL 3150386 (D. Del. Aug. 2, 2012) (clarifying that "actual knowledge" is the correct legal standard and reversing on the ground that actual knowledge was not adequately pleaded); *see generally Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014) ("A decision to act and a conscious decision not to act are thus equally subject to review under traditional fiduciary duty principles.").

In *Lerner*, the Second Circuit noted that "[a]s a general matter, a depositary bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation." 459 F.3d at 287 (quotations and citations omitted). However, "a bank may be liable for participation in [such a] diversion, either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed." *Id.* (quotations and citations omitted). If the bank maintaining the fiduciary account acquires such knowledge, the bank is under an affirmative duty to take action by attempting to stop the diversion. *Id.* at 287-88. These principles were divined under the application of New York common law. *See Bischoff v. Yorkville Bank*, 218 N.Y. 106, 114 (1916).

Defendant correctly notes that Delaware law appears to follow the general rule that a bank usually does not have a duty to a non-customer investor. (Dkt. 19-1 at 31); *see Travelers Cas. & Sur. Co. of Am. v. Bancorp Bank*, 691 F. Supp. 2d 531, 537 (D. Del. 2009) ("Neither party has cited any Delaware case law holding that a depository bank owes a duty of care to a non-customer drawer of a check."); *Browning v. Data Access*

*Sys., Inc.*, No. CIV.A. 09C-10-248FSS, 2011 WL 2163555, at *2 (Del. Super. Ct. Jan. 31, 2011) ("Plaintiffs' negligence claim is dismissed because it fails to identify a duty [the defendant bank] owed Plaintiffs as [the co-defendant's] creditors."). Nonetheless, the parties have not cited to any case law indicating that Delaware law departs from the narrow exception to this general rule as set forth in *Lerner*, and Plaintiffs correctly note that Delaware courts applying Delaware law "often . . . [look] to well-reasoned precedent from federal courts, courts of our sister states, and Anglo-American jurisprudential tradition." *In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 882 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of La. v. Gen. Re Corp.*, 11 A.3d 228 (Del. 2010); *see Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 293 (Del. Ch.) (same), *aff'd*, 126 A.3d 1115 (Del. 2015).

Thus, where, as here, a plaintiff alleges that a defendant bank was aware that investor funds were being chronically sapped from fiduciary accounts and placed into other accounts for purposes that the defendant bank—allegedly—knew were not what the investors intended, the bank acquires knowledge of a breach of a fiduciary duty, and must attempt to prevent the diversion. *Lerner*, 459 F.3d at 287-88, 295. The failure to act upon this duty represents inaction that rises to the level of "substantial assistance" in the primary violator's fiduciary breach to the beneficiaries of the fiduciary accounts. *See id.* at 295; *see also Capitaliza-T II*, 2011 WL 6650329, at *6; *Jenkins*, 2008 WL 1987268, at *14; *see generally Hubbard v. Hollywood Park Realty Enters., Inc.*, No. CIV. A. 11779, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("From a semantic and even legal

viewpoint, "inaction" and "action" may be substantive equivalents, different only in form.").

The Court concludes that Plaintiffs have sufficiently alleged that Defendant was aware of the fiduciary nature of the BPS Fund accounts and knew that the Fund managers' requests were chronically dissipating these fiduciary accounts and commingling Plaintiffs' BPS investments with the funds of other investors. Therefore, because Plaintiffs have also alleged that Defendant—with the benefit of this knowledge—failed to make any effort to safeguard their monies and prevent these diversions, Plaintiffs have stated a claim for aiding and abetting a breach of fiduciary duty, and Defendant's motion to dismiss the amended complaint's third cause of action is denied.

### B.    Gross Negligence Claim

Defendant also argues that Plaintiffs' gross negligence claim should be dismissed because Plaintiffs have failed to allege that Defendant owed them a duty of care. (Dkt. 19-1 at 31). Plaintiffs argue that Defendant owed them a duty because it was a trustee of their funds. (Dkt. 24 at 19). As this Court has already determined that Plaintiffs have sufficiently alleged that Defendant was "under the duty to make reasonable inquiry and endeavor to prevent a diversion" of their funds, *Lerner*, 459 F.3d at 295 (quotations and citation omitted), Defendant's argument is without merit because this duty of care applies to claims sounding in negligence. *See id.* at 288-89; *see also MLSMK Inv. Co.*, 431 F. App'x at 20.

Alternatively, Defendant argues that the allegations in the amended complaint do not satisfy the heightened departure from the standard of care required for a claim to state a cause of action for "gross negligence" as opposed to a cause of action for ordinary negligence. (Dkt. 26 at 32-33). "Gross negligence is a higher level of negligence representing an extreme departure from the ordinary standard of care." *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990) (internal quotations and citation omitted). However, "'a claim for gross negligence does not require the heightened pleading requirements of Rule 9(b).'" *Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 355-56 (E.D.N.Y. 2014) (quoting *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 76 (S.D.N.Y. 2010), *aff'd*, 485 F. App'x. 461 (2d Cir. 2012)). Furthermore, "[g]enerally speaking, issues of negligence are not susceptible of summary adjudication. . . ." *Manerchia v. Kirkwood Fitness & Racquetball Clubs, Inc.*, 992 A.2d 1237, at *2 (Del. 2010).

Giving Plaintiffs the benefit of all favorable reasonable inferences at the motion to dismiss stage of this proceeding, the Court cannot say, as a matter of law, that Defendant's failure to respond to the various "red flags" of suspicious conduct discussed above did not amount to a breach of the heightened duty of care required to state a claim of gross negligence. *See Nigerian Nat. Petroleum Corp.*, 1999 WL 558141, at *8 ("To be sure, [the plaintiff] might be correct in contending that there were several red flags that should have alerted [the defendant] to . . . fraud or at least prompted it to investigate, and that [the defendant] acted negligently in allowing [the fraudster] to make additional wire transfers even after the Second Fraudulent Transfer was uncovered. . . . [The defendant]'s actions may well have been lamentable, . . . even grossly negligent."

(internal quotations and citations omitted)); *see also In re Agape Litig.*, ("*Agape I*") 681
F. Supp. 2d 352, 364 (E.D.N.Y. 2010) (stating that the plaintiff's allegations establishing
constructive knowledge of fraud, "if true, may reflect unfavorably upon [the defendant
bank's] fraud monitoring regime").

Therefore, Defendant's motion to dismiss the fourth cause of action in the
amended complaint alleging gross negligence is denied.

### C.    Breach of Fiduciary Duty Claim

Plaintiffs also argue that Defendant owed them a direct fiduciary duty as the
escrow agent/trustee/custodian of the BPS Funds, and that Defendant breached this duty
by failing to monitor and safeguard the investor monies from the Fund managers' alleged
misconduct. (Dkt. 16 at ¶¶ 289-90).  Defendant argues that it did not owe Plaintiffs a
fiduciary duty because Plaintiffs were not parties to the various escrow agreements and
there is no indication that those agreements broadened Defendant's duties as escrow
agent to safeguard Plaintiffs' investment. (Dkt. 19-1 at 34-35).  As to the existence of
this type of duty, the Court finds that Plaintiffs have at least plausibly alleged such a duty.

Plaintiffs argue that the nature of the escrow agreement inherently imposes a duty
upon the escrow agent in relationship to the investors to the account.  It is true that "[a]
party empowered to act as a custodian for property in dispute, such as an escrow agent, is
generally expected to act neutrally regarding the parties to the dispute." *NAMA Holdings,
LLC v. Related WMC LLC*, No. CV 7934-VCL, 2014 WL 6436647, at *18 (Del. Ch.
Nov. 17, 2014).  However, the duties of the escrow agent are limited.  Under New York
law, "[a]n escrow agreement is a contract like any other.  Given this, it necessarily

follows that parties to an escrow agreement cannot impose upon [the escrow agent] any obligations in addition to its limited duties under the express terms of its contract." *H & H Acquisition Corp. v. Fin. Intranet Holdings*, 669 F. Supp. 2d 351, 363 (S.D.N.Y. 2009) (internal quotations and citations omitted). Delaware law appears to interpret escrow agreements in a similar manner. *See Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 173 (Del. Ch. 2003) ("[I]n essence, an escrow agent is agent to the terms of the escrow contract."). Indeed, despite the obligation of neutrality "'[a]n escrow holder *is not* as such *an agent of either party* to the transaction *until the event occurs which terminates the escrow relation.*'" *Id.* (emphases added) (quoting Restatement (Second) of Agency § 14 D (1958)).

Here, Plaintiffs were not parties to any escrow agreement involving the disputed BPS Fund accounts. Each of these escrow agreements provides that Defendant, BPS Fund, and Velocity were the only three parties to the escrow agreement. (Dkt. 19-3; Dkt. 19-6; Dkt. 19-8; Dkt. 19-10). Plaintiffs allege that they are third-party beneficiaries to the escrow agreements at issue and, as such, Defendant owed them a duty of care as a fiduciary. (Dkt. 16 at ¶ 28). Plaintiffs were not named in any of the escrow agreements at issue, and each escrow agreement purporting to open one of the BPS Fund accounts indicates that the escrow account was "established for the benefit of [BPS]."[4] (Dkt. 19-3; Dkt. 19-6; Dkt. 19-8; Dkt. 19-10); *see Zamora v. JPMorgan Chase Bank, N.A.*, No. 14-

---

[4] The VVG escrow agreement indicates that the funds deposited would be held by Defendant "for the benefit of such subscribers." (Dkt. 24-6 at 2). Notably, the amended complaint does not allege that any Plaintiff initially deposited any money in the VVG escrow account. Thus, this language, which is absent from the BPS escrow agreements, does not aid Plaintiffs.

CV-5344, 2015 WL 4653234, at *4 (S.D.N.Y. July 31, 2015) ("Plaintiffs argue that the 'Escrow and Client Funds Management Account' agreement creates a fiduciary duty. But Baez signed that agreement on behalf of the FIT Entities with JPMorgan. This is insufficient to create a duty between JPMorgan and Plaintiffs." (internal citation omitted)), *appeal dismissed* (2d Cir. 15-2812 Dec. 10, 2015); *Sunnyside Dev. Co., LLC v. Bank of New York*, No. 07 CIV. 8825 (LLS), 2008 WL 463722, at *2 (S.D.N.Y. Feb. 19, 2008) ("There is in the Escrow Agreement no evidence of an intention to benefit [the company], which is thus at most "a mere incidental beneficiary, with no enforceable rights under the contract." (quotations and citations omitted)).

> Under Delaware contract law, a nonparty to a contract generally has no rights relating to it unless he or she is a third-party beneficiary to the contract. In order to qualify as a third-party beneficiary, a party must be an intended, and not an incidental, beneficiary. If the third-party happens to benefit from the performance of the contract either indirectly or coincidentally, such third person has no rights under the contract.

*CitiMortgage, Inc. v. Bishop*, No. CIV.A. 09L-07-313CLS, 2013 WL 1143670, at *5 (Del. Super. Ct. Mar. 4, 2013) (quotations and citations omitted).

> For a party to be deemed a third-party beneficiary to a contract, "(i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a preexisting obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract."

*Arrowood Indem. Co. v. Hartford Fire Ins. Co.*, 774 F. Supp. 2d 636, 658 (D. Del. 2011) (quoting *Madison Realty Partners 7, LLC v. Ag ISA, LLC*, No. CIV.A. 18094, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001)).

Here, Plaintiffs' allegations indicate that they were merely incidental beneficiaries to the escrow agreements. *See Palm Beach Strategic Income, LP v. Salzman*, No. 10-CV-261 JS AKT, 2011 WL 441778, at *6 (E.D.N.Y. Feb. 7, 2011) (holding that the financing plaintiffs were not owed a duty under an escrow agreement where they were not a party to the agreement and did not sufficiently allege third-party beneficiary status). In *HBL Indus., A Div. of Houston Barge Line, Inc. v. Chase Manhattan Bank (Nat. Ass'n)*, 45 B.R. 865 (S.D.N.Y. 1985), the plaintiff argued that the creation of a "special account" created a fiduciary duty in the defendant bank—akin to that of a trustee—which ran to "all potential beneficiaries of the special account." *Id.* at 868. The court rejected this argument finding that "[t]he cases reveal that to the extent a duty is created it runs not to potential beneficiaries, but to those with a more direct interest in the fund," and specifically, the two parties to the agreement that established the special account. *Id.* Likewise, it cannot be said that Plaintiffs were intended third-party beneficiaries without any indication upon the face of the escrow agreements that the funds were established for their direct benefit. Although Plaintiffs were incidentally benefited from the creation of the special accounts, the duties of the escrow agent are limited by the agreement and do not run to all potential incidental investors. *See Zamora*, 2015 WL 4653234, at *4; *Palm Beach Strategic Income, LP*, 2011 WL 441778, at *6; *Fasciana*, 829 A.2d at 173.

However, the Second Circuit in *Lerner* stated that the duty to make reasonable inquiries and to attempt to prevent the diversion of fiduciary monies constitutes, itself, an "independent fiduciary duty." *Lerner*, 459 F.3d at 295 (finding that, although the defendants argued that "they owed no independent fiduciary duty" to the plaintiffs, the

- 40 -

"banks *do* have a duty to safeguard trust funds deposited with them when confronted with clear evidence indicating that those funds are bring mishandled."). "Fiduciary relationships exist when one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side or weakness, *dependence or justifiable trust, on the other*." *WP Devon Asssocs., L.P. v. Hartstrings, LLC*, No. CIV.A. N11C-02216JRJ, 2012 WL 3060513, at \*4 (Del. Super. Ct. July 26, 2012) (emphasis added) (quotations and citations omitted); *see Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, No. 19875, 2005 WL 5757652, at \*8 (Del. Ch. Apr. 1, 2005) ("A fiduciary relationship exists where one party places a special trust in another and relies on that trust, or where a special duty exists for one party to protect the interests of another.").

Here, Plaintiffs allegedly relied upon Defendant to safeguard their funds as the purported escrow agent or trustee named in the offering materials. (Dkt. 16 at ¶¶ 20, 289-90). At oral argument, the parties sharply disputed whether these accounts were merely custodial deposits or were trust and escrow accounts. Nevertheless, Plaintiffs *allege* that the BPS Funds consisted of trust or escrow accounts. (*See, e.g., id.* at ¶¶ 125, 186, 210; Dkt. 16-5 at 2-3; Dkt. 16-6 at 2-4; Dkt. 16-8 at 2). It is further alleged that Defendant was aware of the content of the offering materials, and understood the purposes for which the BPS investors were choosing to invest in the escrow/trust accounts. (*Id.* at ¶¶ 20, 93). "Giving [P]laintiff[s] the benefit of *all reasonable inferences* to be drawn from the [amended] complaint for purposes of this motion to dismiss, [P]laintiff[s] ha[ve] adequately stated a claim for breach of fiduciary duty. . . ." *Meisel v. Grunberg*, 651 F.

Supp. 2d 98, 116 (S.D.N.Y. 2009) (emphasis added). Although the Court could not find any applicable Delaware law on this point, it would be a clear dereliction of common fiduciary principles to allow a bank to knowingly permit the wrongful diversion of trust funds when it has knowledge of its occurrence. *Lerner*, 459 F.3d at 295.

Therefore, as with the Court's findings on the aiding and abetting breach of fiduciary duty claim, because Plaintiffs have sufficiently alleged that Defendant was aware of the diversion and commingling of trust account investments in the BPS Funds, Defendant's motion to dismiss the amended complaint's fifth cause of action alleging breach of fiduciary duty is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (Dkt. 19) is granted insofar as the first and second causes of action in Plaintiffs' amended complaint (Dkt. 16) are dismissed, and it is otherwise denied.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:     September 26, 2017
           Rochester, New York